# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52481-3-II |
| Respondent. | |
| vs. | UNPUBLISHED OPINION |
| ADRIAN TUBIS BROUSSARD[†], | |
| Appellant. | |

MAXA, J. – Adrian Broussard appeals his convictions of first degree theft, forgery, two counts of unlawful possession of a controlled substance with intent to deliver, and one count of unlawful possession of a controlled substance.

Broussard's financial crime convictions arose from his involvement in fraudulent transactions with his half-brothers, Derek James and Anthony Smith. The transactions involved creating auto dealer businesses and using invalid social security numbers in order to obtain loans from credit unions to purchase cars from the auto dealers. The men would then deposit the loan amount into a bank account for one of the auto dealer businesses but would not actually complete the car sale.

Broussard created an auto dealer business, opened business banking accounts for that business, and obtained a loan to purchase a car from James's auto dealer business using an

---

[†] Also identified as Adrian Tobias Elrid Broussard during trial.

invalid social security number. James deposited the check for that loan in a bank account for one of his auto dealer businesses. The bank's recorded video surveillance showed that Broussard was with James when he deposited the check.

Broussard's drug convictions arose from a traffic stop in Tacoma. An officer ran a records check on Broussard's vehicle, which showed that Broussard had failed to transfer title for his vehicle within 45 days as the law required. After stopping Broussard, the officer recognized him from a Tacoma Police bulletin issued regarding an investigation concerning Broussard, James, and Smith. Broussard was arrested, and a search of his person revealed several baggies of cocaine, multiple ecstasy pills, and heroin.

We hold that (1) the trial court did not violate Broussard's right to counsel by denying his motion to replace his defense counsel, (2) the court did not err in denying Broussard's motion to sever his trial from his codefendant Smith's trial, (3) the court did not err in admitting evidence regarding James's crimes, (4) Broussard's ineffective assistance of counsel claims based on defense counsel's failure to renew his motion for a severance and to move to suppress the evidence seized from him fail, and (5) the evidence was sufficient to sustain the two convictions of unlawful possession of cocaine and ecstasy with intent to deliver. Accordingly, we affirm Broussard's convictions.

FACTS

*Broussard's Financial Crimes*

On April 12, 2016, Broussard registered a business named "Brown Bear Autos" with the Secretary of State. On the same day, James registered a business named "Fast Lane Autos." On June 17, Smith registered a business named "A.J. Motors." Broussard, James, and Smith each opened bank accounts for their businesses.

2

On June 10, Broussard applied for an auto loan from TAPCO Credit Union to purchase a vehicle from Fast Lane Autos. In completing the application, Broussard used an invalid social security number that had never been assigned to any person. Surveillance footage showed that it was Broussard who applied for and obtained the loan. TAPCO issued a check to Broussard in the amount of $13,400 made payable to Fast Lane Autos. On the same day, James deposited the TAPCO check into a Wells Fargo banking account for Fast Lane Autos. Broussard never purchased the vehicle.

Tacoma Police investigated the fraudulent transactions involving Broussard, James, and Smith. Following this investigation, a bulletin was issued for probable cause to arrest for theft and to notify other law enforcement officers about the investigation.

*Broussard's Drug Crimes*

On September 2, Tacoma Police Officer Randall Frisbie ran a records check on a vehicle Broussard was driving. The records check showed that the title for the vehicle had not been transferred within the 45-day period required. Based on this information, Frisbie initiated a traffic stop of the vehicle. During the traffic stop, Frisbie identified the driver of the vehicle as Broussard and recognized Broussard's name from the Tacoma Police bulletin. Frisbie told Broussard he was under arrest. Broussard drove away, but he was located and arrested.

At the jail, Broussard was searched by a booking officer. During the search, the officer seized a plastic baggie containing 19.2 grams of cocaine in 21 individual baggies, 68 ecstasy pills, and a small plastic bag containing heroin.

*Criminal Charges and Motion to Sever*

The State charged Broussard with first degree theft, forgery, attempting to elude a pursuing police vehicle, two counts of unlawful possession of a controlled substance with intent

to deliver (cocaine and ecstasy), and unlawful possession of a controlled substance (heroin). He was charged as both a principal or as an accomplice on the theft and forgery charges. James and Smith were charged as codefendants. The three cases were joined for trial, but James eventually entered a guilty plea prior to trial. Broussard and Smith both moved to sever their cases. The trial court denied both motions.

*Admission of Evidence Regarding James's Crimes*

The State sought to introduce other act evidence concerning James's crimes. This evidence consisted of loan applications, bank account applications, photographs of deposit slips and checks, and bank statements – most bearing James's name – and surveillance video snapshots from these transactions.

The trial court admitted this evidence under ER 404(b) and ER 403 as "circumstantial evidence of an overall criminal scheme and the defendants' knowledge of it and their motive and intent to participate." 7 Report of Proceedings (RP) at 951. The court found that the jury could draw reasonable inferences from the other act evidence that "each man knew and understood the overall scheme and participated to one degree or another in fraudulently obtaining loans for fake auto sales using social security numbers that belonged to others or in one case a number that had never been issued by the Social Security Administration." 7 RP at 946.

*Request to Replace Defense Counsel*

On the first day of trial, Broussard requested that the trial court remove defense counsel and substitute a private attorney. Broussard alleged that defense counsel argued with him, told him to meet at his office but did not show, did not come to talk to him about his case while incarcerated, and lied to him. Broussard also expressed concerns about his ability to communicate with defense counsel and about counsel properly representing him.

Defense counsel joined Broussard in his request. He stated to the court:

I know that in all my years of practice, I know that I don't always get along with my clients, but I am concerned about the inability for Mr. Broussard and I to communicate, and it has gotten to a point where it has just totally deteriorated, Your Honor.
. . .

I was appointed on a different case, Your Honor, where [Broussard] was charged with felony elude. That happened in January. We were able to do motions. We were able to do things in going forward with that case. Mr. Broussard ended up resolving that matter. We negotiated with the State and he ended up entering a guilty plea on it, Your Honor.
. . .

Mr. Broussard and I, I would say our communication has been strained and it's been that way for a while. But, again, that by itself is not enough, Your Honor. It's just that my concern is – and it's very clear to me that Mr. Broussard does not want to communicate with me, and I do not see how I can go forward in this trial if he's not going to communicate and we're going to be able to discuss what happened in trial, what do we expect tomorrow, what do we need to be careful about. I mean, there's all these things, Your Honor. I don't see, based on what happened on Friday and based on what's happening today, is that I don't see how I can continue to represent him.

1 RP at 6, 19, 21.

The court stated that it had received mixed information from defense counsel and Broussard in that defense counsel had said that he had effective communications with Broussard in another case. The court asked defense counsel if he was prepared to try Broussard's case and he stated he could go forward.

The State also expressed concerns about the breakdown in communication. To that end, the State suggested that the trial court hold an in-camera hearing where defense counsel could elaborate on the issues with Broussard without violating any attorney-client privilege.

The trial court denied Broussard's request to remove defense counsel or continue his case. The court also found that Broussard's request to remove defense counsel was untimely because it was not made until the first day of trial.

*Broussard's Clothing at Trial*

A few days before trial, defense counsel had visited Broussard in jail to discuss wearing civilian clothing at trial. Defense counsel told the court that Broussard would not cooperate. The next day, Broussard appeared in court in jail clothes. Broussard claimed that defense counsel had not attempted to talk to him about civilian clothing, but defense counsel maintained that he had tried – unsuccessfully – to communicate with Broussard.

The trial court tried to inquire about Broussard's decision to wear jail clothes and to warn him of the likely prejudicial impact it would have on the jury. Broussard was uncooperative and refused to answer the court directly at times. The court observed that Broussard was "deliberately being evasive" and "unwilling to answer [its] questions," and stated it was "not going to waste any more of [its] time asking this question again this morning." 3 RP at 245-46.

Ultimately, the court concluded that it was "convinced that if there is a breakdown in communication here, it's because Mr. Broussard has made a deliberate decision to not talk with his lawyer." 2 RP at 61. The court reasoned that "Mr. Broussard, even in the face of the Court's directive yesterday that he is to wear civilian clothing today to court and that he is to go forward in this case with [defense counsel] as his lawyer, . . . has now continued on with his deliberate decision to not communicate with his attorney because he wants a different lawyer. He doesn't want to represent himself. He doesn't want to have a different attorney step into this case who's paid at public expense." 2 RP at 62.

*Verdict*

The jury found Broussard guilty of first degree theft, forgery, two counts of unlawful possession of a controlled substance with intent to deliver, and one count of unlawful possession of a controlled substance. Broussard appeals his convictions.

ANALYSIS

A.      MOTION TO SUBSTITUTE DEFENSE COUNSEL

Broussard argues that the trial court violated his constitutional right to counsel by denying his request to remove his appointed defense counsel. We disagree.

      1.    Legal Principles

A criminal defendant has a constitutional right to counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. However, a defendant does not have an absolute right to choose his counsel. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). To justify replacing appointed defense counsel, the defendant must show good cause. *Id*. Good cause includes a conflict of interest, irreconcilable conflict, or a complete breakdown in communication. *Id*.

When the relationship between the defendant and defense counsel has completely collapsed, the trial court's refusal to substitute new counsel violates the right to counsel. *State v. Cross*, 156 Wn.2d 580, 606, 132 P. 3d 80 (2006). But the defendant's general dissatisfaction with or loss of trust or confidence in defense counsel is not sufficient cause to appoint new counsel. *Varga*, 151 Wn.2d at 200. The relationship between the defendant and counsel must be so diminished as to prevent presentation of an adequate defense. *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997).

We review a trial court's denial of a request to replace appointed counsel for an abuse of discretion. *Varga*, 151 Wn.2d at 200. When reviewing such a decision, we consider (1) the extent of any conflict between the defendant and counsel, (2) the adequacy of the trial court's inquiry into that conflict, and (3) the timeliness of the motion to appoint new counsel. *Cross*, 156 Wn.2d at 607.

2.  Extent of the Conflict

Broussard asserts that he and his counsel had a complete breakdown in communications that deprived Broussard of his right to counsel. However, "[i]t is well settled that a defendant is not entitled to demand a reassignment of counsel on the basis of a breakdown in communications where he simply refuses to cooperate with his attorneys." *State v. Schaller*, 143 Wn. App. 258, 271, 177 P.3d 1139 (2007); *see also State v. Thompson*, 169 Wn. App. 436, 457-58, 290 P.3d 996 (2012).

Here, the trial court found that Broussard caused the communication breakdown by refusing to talk with his defense counsel. The court concluded that it was "convinced that if there is a breakdown in communication here, it's because Mr. Broussard has made a deliberate decision to not talk with his lawyer." 2 RP at 61. The court specifically observed that Broussard was actively engaged in reviewing paperwork and having some level of discussion with defense counsel during jury selection and the exercise of preemptory challenges. Therefore, the court determined that Broussard was "capable, if . . . willing, to communicate appropriately with [defense counsel]." 1 RP at 42.

We conclude that the court's findings are supported by the record. Defense counsel indicated that the reason for the strain was Broussard's own refusal to cooperate and not defense counsel's failure to engage or try to communicate. In reflecting on his ability to communicate with Broussard, defense counsel stated that "*Mr. Broussard* does not want to communicate with me . . . I do not see how I can go forward in this trial if *he's* not going to communicate." 1 RP at 20-21 (emphasis added). Defense counsel further stated, "I don't believe *he* wishes me to be a part of this or have communication with him or go to the jail to meet with him." 1 RP at 26

(emphasis added). Notwithstanding Broussard's general intransigence, defense counsel stated that he could go forward with the trial. These statements suggest that the conflict was one sided.

The record reflects that there were communication difficulties, largely of Broussard's own making. Therefore, we conclude that neither the nature nor the extent of the conflict between Broussard and his attorney justified replacing defense counsel.

3. Adequacy of the Trial Court's Inquiry

Broussard also contends that the trial court failed to make an adequate inquiry into his request to replace defense counsel. He concedes that the court questioned whether he and defense counsel were able to communicate. But he claims that the court should have held an in-camera hearing to address the issue. We disagree.

To conduct an adequate inquiry, the trial court must make a "meaningful" inquiry that includes a "full airing" of the defendant's concerns. *Cross*, 156 Wn.2d at 610. This inquiry should " provide a 'sufficient basis for reaching an informed decision.' " *Thompson*, 169 Wn. App. at 461 (quoting *United States v. Adelzo–Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001)). The court " 'may need to evaluate the depth of any conflict between defendant and counsel, the extent of any breakdown in communication, how much time may be necessary for a new attorney to prepare, and any delay or inconvenience that may result from substitution.' " *Id.* (quoting *Adelzo–Gonzalez*, 268 F.3d at 777).

Here, the trial court performed multiple inquiries into the breakdown of communications. Both defense counsel and Broussard were allowed to express their concerns at four hearings. The court noted that it had already granted "nine or more continuances" and it would not delay the case any further for Broussard to find another private counsel. 1 RP at 42. Broussard points

us to no Washington case law that requires the court to have done more. Therefore, we conclude that the trial court performed an adequate inquiry into his request to replace counsel.

### 4. Timeliness of Broussard's Request

Broussard appears to argue that he made a timely motion for a new attorney. Specifically, he made his request before the commencement of trial. We disagree.

A trial court may reject a request to substitute counsel if the request is untimely. *Stenson*, 142 Wn.2d at 732. Here, the trial court found that Broussard's request was untimely. We hold that the court's finding is supported by the record.

Broussard brought his request to substitute a private attorney for defense counsel on the first day of trial. But as the trial court observed, Broussard had ample opportunity to substitute counsel before the start of trial. His case began in September 2016 and he had received nine or more continuances. Therefore, we hold that the trial court properly found that Broussard's motion to substitute counsel was untimely.

### 5. Summary

The standard of review for denial of a request to replace appointed counsel is abuse of discretion. *Varga*, 151 Wn.2d at 200. We conclude that the trial court did not abuse its discretion when it denied Broussard's request for new counsel because (1) Broussard caused the breakdown in communication with defense counsel, (2) the court adequately inquired into the alleged breakdown, and (3) Broussard's request was untimely. Accordingly, we hold that the trial court did not err in denying Broussard's request to replace his defense counsel.

### B.    MOTION TO SEVER

Broussard argues that the trial court erred in denying his motion to sever his trial from Smith's trial. We disagree.

CrR 4.4(c)(2)(i) states that the trial court should grant a severance of defendants before trial if "it is deemed appropriate to promote a fair determination of the guilt or innocence of a defendant." Severance of trials is within the discretion of the trial court. *State v. Moses*, 193 Wn. App. 341, 359, 372 P.3d 147 (2016). Therefore, we review for an abuse of discretion a trial court's decision on a motion for severance under CrR 4.4(c). *Id.* Separate trials are not favored. *Id.*

To show that the trial court abused its discretion in denying severance, "the defendant must be able to point to specific prejudice." *State v. Sublett*, 176 Wn.2d 58, 69, 292 P.3d 715 (2012). Specific prejudice can be shown by (1) conflicting antagonistic defenses that are irreconcilable and mutually exclusive, (2) the inability of the jury to separate massive and complex evidence between the two defendants, (3) the fact that the codefendant will make an inculpating statement regarding the moving defendant, and (4) a gross disparity in the weight of the evidence against the two defendants. *Moses*, 193 Wn. App. at 360.

Broussard argues that severance was appropriate because the charges against him and against Smith were completely independent. The only connection between the two was that they were half-brothers and they acted independently with James. However, Broussard does not explain why this fact caused him any prejudice.

Broussard briefly argues that there was a massive amount of evidence introduced at trial that had nothing to do with him, which he claims confused the jury. He contends that the jury could not separate out Smith's bad acts from the charges against Broussard. However, as Broussard acknowledges, the cases against him and Smith were completely separate. There is no indication that the jury could not segregate the evidence relating to each codefendant.

In addition, the trial court instructed the jury that "[a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Clerk's Papers at 47. And each defendant was named in his own set of to-convict jury instructions. Therefore, the court instructed the jury to evaluate the guilt of Broussard and Smith separately.

We hold that the trial court did not abuse its discretion in denying Broussard's motion to sever.

C.    ADMISSION OF JAMES'S "OTHER ACTS" EVIDENCE

Broussard argues that the trial court erred in admitting evidence of James's crimes under ER 404(b). Broussard challenges the court's ruling with respect to (1) the relevance of the evidence and (2) the ER 403 balancing analysis. We reject Broussard's argument.

1.    Legal Principles

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). ER 404(b)'s list of other purposes for which evidence of a defendant's prior misconduct may be introduced is not exclusive. *State v. Baker*, 162 Wn. App. 468, 473, 259 P.3d 270 (2011). ER 404(b) must be read in conjunction with ER 403, which requires the trial to court to exercise its discretion in evaluating whether relevant evidence is unfairly prejudicial. *See State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014).

Before a trial court admits evidence under ER 404(b), it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for admitting the evidence,

(3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value of the evidence against its prejudicial effect. *Gunderson*, 181 Wn.2d at 923. The trial court must complete this ER 404(b) analysis on the record in order to permit the appellate court to determine whether the trial court's exercise of discretion was based on careful and thoughtful consideration of the issue. *Id.*

We review evidentiary rulings under ER 404(b) for abuse of discretion. *Id.* at 922. If evidence was improperly admitted, we analyze whether the improper admission was harmless. *Id.* at 926.

2.    Relevance of the Other Act Evidence

Broussard argues that the other act evidence was not relevant under 404(b) because a scheme to defraud financial institutions was not an element of any of his charged crimes. We disagree because this evidence was relevant under a theory of accomplice liability.

Here, the trial court admitted the other act evidence of James's crimes under ER 404(b) and 403 as "circumstantial evidence of an overall criminal scheme and the defendants' knowledge of it and their motive and intent to participate." 7 RP at 951. The surveillance videos showed Broussard and James together; Broussard procuring an auto loan from Fast Lane Motors, owned by James; and James depositing the check for that loan into the Wells Fargo account for Fast Lane Motors.

The State charged Broussard both as a principal and as an accomplice to first degree theft and forgery. To prove accomplice iabuility, the State needed to show that he knowingly promoted or facilitated the commission of these crimes by (1) soliciting, commanding, encouraging, or requesting another person to commit the crimes; or (2) aiding or agreeing to aid another in the planning or committing of the crimes. RCW 9A.08.020(3)(a)(i)-(ii).

The trial court found that the jury could draw reasonable inferences from the other act evidence that "each man knew and understood the overall scheme and participated to one degree or another in fraudulently obtaining loans for fake auto sales" using false social security numbers. 7 RP at 946. We conclude that the other act evidence linking Broussard and James amply supported this inference and was relevant to prove Broussard's knowledge, motive, and intent under an accomplice liability theory. Therefore, we reject Broussard's relevance argument.

### 3. ER 403 Balancing

Broussard argues that evidence regarding James's crimes was not admissible under ER 403 because it was overly prejudicial. He claims that by focusing on James's crimes, the State made it appear that Broussard was involved in a large scale plan to commit fraud. We disagree.

Here, the trial court admitted the evidence of James's crimes as "circumstantial evidence of an overall criminal scheme," "the defendants' knowledge of it," and "their motive and intent to participate." 7 RP at 951. ER 404(b) plainly states that other acts may be admitted to demonstrate knowledge, motive, and intent. The court found that the evidence was highly probative to that end. The evidence demonstrated a scheme among James, Smith, and Broussard to fraudulently obtain auto loans and Broussard's part in this scheme.

The trial court determined that any risk of prejudice was minimal. The court observed that evidence of James's activity was separate from that of Broussard and Smith. For example, the documentation regarding each transaction bore the names or photographs of who was involved. Therefore, the risk of the jury being confused or misled by the evidence was very low. That court also noted that the State did not attempt to mislead the jury into thinking that

14

Broussard should be held accountable for fraudulent transactions in which he did not directly participate. Further, the court found that the evidence had no emotional or inflammatory content.

We conclude that the trial court did not abuse its discretion in ruling that ER 403 did not preclude admission of the evidence of James's crimes. Therefore, we hold that the trial court did not err in admitting this evidence.

D.      INEFFECTIVE ASSISTANCE OF COUNSEL

Broussard contends that his trial counsel was ineffective because he failed to (1) renew Broussard's motion to sever and (2) file a motion to suppress evidence obtained as a result of the traffic stop. We disagree.

1.      Standard of Review

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). We review ineffective assistance of counsel claims de novo. *Id.* at 457.

To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced him or her. *Id*. at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id*. at 458. Prejudice exists if there is a reasonable probability that, except for counsel's error, the result of the proceeding would have been different. *Id*.

2.      Failure to Renew Motion to Sever

Broussard contends that his attorney's failure to renew the severance deprived him of effective assistance of counsel. We disagree.

15

If a defendant's pretrial motion for severance has been denied, he or she may renew the motion on the same ground before or at the close of all the evidence. CrR 4.4(a)(2). Severance is waived by failing to renew the motion. CrR 4.4(a)(2). Here, defense counsel failed to renew the motion to sever and therefore the motion was waived.

However, defense counsel's failure to file a renewed motion does not support an ineffective assistance of counsel claim unless the defendant can show that the motion would have been granted if made. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 711, 101 P.3d 1 (2004). As we hold above, the trial court did not err in denying the pretrial motion to sever. Because Broussard provides no reason to believe that the trial court would have granted a renewed motion, he cannot show deficient performance or prejudice. We hold that Broussard's ineffective assistance of counsel claim on this basis fails.

3. Failure to File Motion to Suppress

Broussard contends that his attorney's failure to file a suppression motion based on a pretextual stop constituted ineffective assistance of counsel. We hold that the record is insufficient for Broussard to meet his burden of showing ineffective assistance of counsel.

a. Legal Principles

In the context of failing to file a motion to suppress, defense counsel's performance will only be considered deficient if the defendant can show that the trial court likely would have granted the motion. *State v. D.E.D.*, 200 Wn. App. 484, 490, 402 P.3d 851 (2017). "[T]here is no ineffectiveness if a challenge to admissibility of evidence would have failed." *State v. Nichols*, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007). Therefore, the question here is whether the trial court likely would have granted a motion to suppress evidence related to the traffic stop if defense counsel had filed one.

16

Article I, section 7 of the Washington Constitution prohibits pretextual traffic stops. *State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999). A pretextual traffic stop occurs when a law enforcement officer stops a vehicle in order to conduct a speculative criminal investigation unrelated to enforcement of the traffic code. *Id.* at 349. Whether a given stop is pretextual depends on the totality of the circumstances, "including both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior." *Id.* at 359. A traffic stop is not pretextual even where the officer has an additional motivation for conducting the stop apart from a suspected traffic violation, as long as the officer's purported motive in investigating a suspected traffic violation was an actual, conscious, and independent reason for the stop. *State v. Chacon Arreola*, 176 Wn.2d 284, 299-300, 290 P.3d 983 (2012).

b.      Validity of the Traffic Stop

Article I, section 7 prohibits warrantless searches unless one of the exceptions to the warrant requirement applies. *State v. Froehlich*, 197 Wn. App. 831, 837, 391 P.3d 559 (2017). One exception is a traffic stop based on a "reasonable articulable suspicion of either criminal activity or a traffic infraction." *Chacon Arreola*, 176 Wn.2d at 292-93.

However, a traffic stop purportedly based on a traffic infraction is unconstitutional under article I, section 7 when the infraction is a pretext for conducting a criminal investigation unrelated to the driving. *Id*. at 294. "A pretextual traffic stop occurs when a police officer relies on some legal authorization as a 'mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.' " *Chacon Arreola*, 176 Wn.2d at 294 (quoting *Ladson*, 138 Wn.2d at 358). To determine whether a stop is pretextual, the court considers the totality of the circumstances, which includes both the officer's subjective intent and the objective reasonableness of the officer's behavior. *Ladson*, 138 Wn.2d at 358-59.

A traffic stop based on both legitimate and illegitimate grounds – a "mixed-motive" traffic stop – does not violate article I, section 7 under certain circumstances. *Chacon Arreola*, 176 Wn.2d at 297-300. The court in *Chacon Arreola* held that a traffic stop is not pretextual if "investigation of either criminal activity or a traffic infraction (or multiple infractions), for which the officer has a reasonable articulable suspicion, is an actual, conscious, and independent cause of the traffic stop." *Id*. at 297. The court stated that the presence of an illegitimate reason for the traffic stop is material to "whether the officer really stopped the vehicle for a legitimate and independent reason (and thus would have conducted the traffic stop regardless)." *Id*. at 299.

c.     Analysis

Broussard argues that the facts and circumstances in the record indicate that the traffic stop was pretextual. He appears to claim that failure to transfer title, in violation of RCW 46.12.650(5)(a)'s requirement of transferring title within 15 days of delivery of a vehicle, does not constitute a traffic infraction under RCW 46.63.020. We disagree.

This court held in *State v. Hendricks* that the failure to apply for a certificate of title within 15 days of delivery of a vehicle is a "traffic violation" under RCW 46.63.020. 4 Wn. App. 2d 135, 143, 420 P.3d 726 (2018). Therefore, the evidence shows that Broussard was stopped on legitimate grounds. Officer Frisbie initiated a traffic stop of Broussard after running a records check on Broussard's vehicle. The records check revealed that title of the vehicle had not yet been transferred.

If defense counsel had filed a suppression motion on the physical evidence seized from Broussard incident to the stop, the trial court would have had to determine whether this was a mixed-motive traffic stop. If so, the court would have had to decide if the vehicle's title was an "actual, conscious, and independent cause of the traffic stop" and whether Broussard made an

"independent and conscious determination that a traffic stop to address a suspected traffic infraction [was] reasonably necessary in furtherance of traffic safety and the general welfare." *Chacon Arreola*, 176 Wn.2d at 297, 298-99.  In addition, the trial court would have had to determine whether Broussard's arrest was supported by probable cause.

But the record is insufficient for us to determine how the trial court would have resolved these issues.  Because there was no suppression hearing, Frisbie was not asked about his motivation for stopping Broussard's car beyond confirming that the title to the vehicle had not yet been transferred.  There is no evidence that reveals whether Broussard's failure to transfer title was an actual, conscious and independent reason for the stop or whether Frisbie determined that a traffic stop was reasonably necessary to address the violation.  There is no evidence that reveals whether Frisbie would have made the traffic stop based on the failure to transfer title regardless of pretext, if any.  And the record is not fully developed regarding the circumstances of Broussard's arrest.

The absence of a sufficient record precludes Broussard from meeting his burden of proving that the trial court would have granted a suppression motion if defense counsel had filed one.  Therefore, Broussard cannot establish that his defense counsel's performance was deficient. *See D.E.D.*, 200 Wn. App. at 490.

Broussard argues that we should remand this matter for a suppression hearing under *State v. Robinson*, 171 Wn.2d 292, 306, 253 P.3d 84 (2011).  But *Robinson* is distinguishable.  The appropriate means for addressing an issue that requires evidence not in the record is through a personal restraint petition. *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018).

We hold that Broussard's ineffective assistance of counsel claim on this basis fails.

E.      SUFFICIENCY OF THE EVIDENCE

Broussard argues that the State failed to present sufficient evidence to prove that he intended to deliver the cocaine and ecstasy that he possessed.  He argues that there was no evidence other than the quantity of drugs to support the intent to deliver element of the offense. We disagree.

1.      Standard of Review

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.  *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the State.  *Id*. at 265-66.  Credibility determinations are made by the trier of fact and are not subject to review.  *Id*. at 266.  Circumstantial and direct evidence are equally reliable.  *Id*.

2.      Legal Principles

In order to prove unlawful possession of a controlled substance with intent to deliver, the State had to prove (1) unlawful possession (2) of a controlled substance (3) with the intent to deliver.  RCW 69.50.401(1).[1]

As a general rule, "[m]ere possession of a controlled substance, including quantities greater than needed for personal use, is not sufficient to support an inference of intent to deliver." *State v. O'Connor*, 155 Wn. App. 282, 290, 229 P.3d 880 (2010).  But a finder of fact can infer

---

[1] RCW 69.50.401 was amended in 2019.  Because those amendments do not affect our analysis, we cite to the current version of the statute.

intent to deliver from possession of a significant amount of a controlled substance plus at least one additional factor. *Id.* Several courts have upheld convictions for intent to deliver based on a large amount of drugs and additional evidence. *See, e.g., State v. Hotchkiss*, 1 Wn. App.2d 275, 281-82, 404 P.3d 629 (2017) (8.1 grams of methamphetamine and $2,150 in cash sufficient); *O'Connor*, 155 Wn. App. at 291 (a large amount of marijuana, a sophisticated grow operation, and a scale sufficient); *State v. Simpson*, 22 Wn. App. 572, 575-76, 590 P.2d 1276 (1979) (quantity of drugs and nature of packaging sufficient); *State v. Harris*, 14 Wn. App. 414, 418-19, 542 P.2d 122 (1975) (quantity of drugs, and a scale sufficient).

3.   Cocaine

Officer Martin testified that Broussard had 19.2 grams of cocaine individually packaged in 21 baggies. Martin testified that drug dealers often package narcotics for sale in "plastic baggies" or a "sandwich bag that's twisted up and . . . clipped." 8 RP at 1052. He also stated the most common weight he had seen for cocaine sold at the street level was around seven grams. In addition, if one person were to consume all 19 grams, the result would be "undoubtedly fatal." 8 RP at 1071. Therefore, the quantity Broussard had on his person – "slightly less than one gram per bindle" – would "be consistent with individual sales, or . . . the preparation of individual sales." 8 RP at 1065.

Broussard argues that merely possessing a quantity of drugs that he could have sold is insufficient to establish intent to deliver. But the quantity of drugs plus the nature of the packaging supports an inference of possession with an intent to deliver the cocaine. *Simpson*, 22 Wn. App. at 575-76; *Harris*, 14 Wn. App. at 418-19.

Broussard also argues that there was no intent to deliver because the baggies were wrapped together under his clothing. Therefore, the drugs were "secreted in a way that could not

have been accessed [for delivery] without great difficulty." Br. of Appellant at 44. But viewing the evidence in the light most favorable to the State, it is conceivable that Broussard could still access these drugs to sell individually.

We hold that the State presented sufficient evidence to prove that Broussard had an intent to deliver the cocaine.

4.    Ecstasy Pills

Officer Martin testified that Broussard had 68 ecstasy pills containing methamphetamine. In total, the pills had an approximate street value of $340. And he stated that if one person consumed all of the pills, the result would be fatal. Based on these observations, Martin testified the quantity Broussard had on his person was not consistent with personal use.

Two pieces of evidence beyond the number of pills support an inference that Broussard had an intent to sell the ecstasy pills. First, the cocaine in his possession was packaged for sale. That fact suggested that Broussard also planned to sell the ecstasy.

Second, at the time of his arrest, Broussard stated he was planning on attending a Wiz Khalifa concert in Seattle, which would present a rave party environment. Martin testified that Broussard's plan to attend the rave party concert was significant because methylenedioxymethamphetamine (MDMA), a byproduct of methamphetamine, "was made big and made popular during the Rave cultures in about the early 2000s." 8 RP at 1053. Accordingly, "there [wa]s likely going to be the potential for the need or want for specific types of narcotics" at the concert. 8 RP at 1065.

We hold that the State presented sufficient evidence to prove that Broussard had an intent to deliver the ecstasy pills.

CONCLUSION

We affirm Broussard's convictions.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, J.

We concur:

SUTTON, A.C.J.

GLASGOW, J.

23